**E-FILED**
Monday, 28 November, 2005  10:27:19 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

**Gregory Moore,**

        **Plaintiff,**

                **vs.**                       **04-1151**

**Mr. Samolia,**

        **Defendant.**

### ORDER

Before the court are the defendant's summary judgment motion, d/e 22, and the plaintiff's response thereto, d/e 26.

### Background

The plaintiff, Gregory Moore, a federal prisoner, currently incarcerated at the Federal Correctional Institution (hereinafter FCI) in Milan, Michigan, filed a complaint pursuant to 28 U. S. C. Section 1331 and under *Bivens v. Six Unknown Names Agents of Fed. Bureau of Narcotics*, 403 U. S. 388 (1971). Mr. Moore names as a defendant, Ferdinand Samalia (sued as Mr. Samolia), the Health Service Administrator, in both his individual and official capacity. In his complaint, d/e 9, the plaintiff claims that it is medically documented that he requires reconstructive shoulder surgery, knee surgery and "ankle/foot correction." He claims he made numerous requests to the Medical Department at FCI, Pekin to provide him with medical treatment or surgery, but all his efforts have been in vain. The plaintiff claims he is in constant pain and discomfort and that it is painful for him to stand in the meal lines. He states that he is a chronic care inmate who is being neglected by the medical staff at FCI, Pekin. He further claims the defendant is in a position to make sure that he gets the proper medical attention and surgery, but instead the defendant has been deliberately indifference to his serious medical problems. The plaintiff claims he has repeatedly asked

to see an orthopedist and was told he was on a wait list.  He returned several times to the Medical Department to check on the status of the wait list, but was told that the prison no longer had an orthopedist.  Two months before he filed this lawsuit, the plaintiff was told that he would be put back on a list.  The plaintiff claims he has exhausted all administrative remedies and has received no relief.    Liberally construed, the plaintiff claims Samalia violated the plaintiff's Eighth Amendment rights when the plaintiff was not allowed to see an orthopedist or have reconstructive surgery for his shoulder and knee and "ankle foot/correction.

### Standard for Summary Judgment

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Herman v. National Broadcasting Co., Inc.,* 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied,* 470 U.S. 1028 (1985).  In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party.  *Beraha v. Baxter Health Corp.,* 956 F.2d 1436, 1440 (7th Cir. 1992).

A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires a trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359 (7th Cir. 1988). A "metaphysical doubt" will not suffice. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Disputed facts are material only if they might affect the outcome of the suit. *First Ind. Bank v. Baker,* 957 F.2d 506, 507-08 (7th Cir. 1992). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, *247-248, 106 S.Ct. 2505, 2510 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson, 477* U.S. at 249.

### Defendant's Summary Judgment Motion

The defendant agues that judgment is warranted because 1) Samalia cannot be liable in his official capacity as there has been no waiver of sovereign immunity; 2) Samalia is not liable as he is an administrator and does not provide direct health care to inmates; and 3) the medical staff was not deliberately indifferent to Moore's medical condition. The defendant asserts that the staff closely monitored Moore's medical condition and attempted to treat his pain conservatively in accordance with the recommendations of earlier outside consultants. Also, because of the plaintiff's age, he was not a candidate for surgical joint replacement. Further, the treating doctors testified, for the short time that Moore was at FCI Pekin, his diabetes and hypertension were uncontrolled (due in main part to Moore's failure to follow dietary and medication restrictions) and those conditions needed to be controlled before he could tolerate surgery.

3

In response, the plaintiff argues that the defendant is liable because as the administrator of the medical facility at FCI Pekin, he was responsible for approving or denying medical care to the plaintiff.  The plaintiff asserts that the "Defendant's refusal to order reconstructive surgery in (sic) his ankle and shoulder, after an orthopedic specialist recommended it, constitutes deliberate indifference."  The plaintiff further asserts that he was "seen by three orthopedic specialists, all of whom recommended total shoulder replacement, yet the Defendant refused to approve the surgery on Plaintiff's shoulder and ankle."  Further, the plaintiff asserts that "[i]n the Bureau of Prisons, the Hospital Administrator is the last word in authorizing surgery.  The Doctors at Pekin are directed by the defendant to minimize medical expenditure.  Their statements are self-serving and do not contradict the recommendations made by outside medical specialists."  The plaintiff argues that his allegations rise to the level of a constitutional violation and the acts and omissions of the defendant were deliberate indifference to the plaintiff's serious medical needs.  The plaintiff's response is not supported with affidavits or certified medical records.  Further, he did not submit a response to the defendant's undisputed facts.  The plaintiff merely rests on his pleadings.

## Undisputed Facts

1.    The plaintiff is a federal inmate currently incarcerated at the Federal Correctional Institution (FCI) in Milan, Michigan.  (App. 36).  He was incarcerated at FCI Pekin, Illinois, from April 23, 2003, to June 25, 2004.  (App. 36).

2.    The plaintiff alleges that his medical needs are being neglected by medical staff at FCI Pekin.    (Complaint, pg. 4).    He specifically alleges that he requires reconstructive shoulder surgery, knee surgery, and ankle/foot correction. (Complaint, pg. 4).

3.    The plaintiff asserts his claims against defendant Samalia, the Health Services Administrator, in his individual and official capacities, pursuant to 28 U.S.C. § 1331. (Complaint, pg. 1).   The plaintiff alleges that Mr. Samalia is in a position to make sure that he gets the proper medical attention and surgery, and that Mr. Samalia has displayed deliberate indifference toward his medical and physical problems. (Complaint, pg. 4).

4.    On May 17, 2005, the plaintiff gave a sworn statement in his deposition. A copy of that transcript is attached to defendant's motion as App.1-20.

5.    To support his claim that he needed surgery while he was an inmate at FCI Pekin, the plaintiff relies upon several doctors' reports that state he will need to have surgery for his shoulder and his foot at some time.  These reports are attached to his deposition transcript as App.16-20.

6.    Exhibit 1 attached to the plaintiff's deposition contains two reports from Dr. Robert Bateman.  (App.16).  On August 28, 1999, Dr. Bateman wrote: "He will need to have

a total shoulder replacement....  He will need to get a MRI of the left shoulder to evaluate it more thoroughly....  He needs to continue taking Motrin....  (App. 16).  On September 14, 1999, Dr. Bateman wrote that the plaintiff needs to see an orthotist for corrective shoes and that he needs a MRI to determine the correct procedure to be done for probably a surgical replacement.  (App. 16).  At that time, the plaintiff was incarcerated at FCI Beckley. (App. 4).

7.     Exhibit 2 attached to the plaintiff's deposition is a report from Dr.  Timothy Domer, D.O. made on April 11, 2000, while the plaintiff was at FCI, Elkton.  (App. 17).  That report states: "There are no specific recommendations for treatment other than symptomatically at this time.  I did offer the patient an intra-articular Cortisone injection to the right ankle.  He did refuse.  The patient has markedly severe arthritis to the left shoulder and really his only option is for possibly total shoulder replacement.  There are no acute recommendations are [sic] for symptomatic treatment.  A lighter shoe may benefit the patient for symptomatic relief of pain secondary to the arthritic changes of the right ankle."  (App. 17).  The plaintiff acknowledges that Dr. Domer did not recommend surgery at that time, but only recommended that his symptoms be treated.  (App. 7).

8.     From April of 2001 until April of 2003, the plaintiff was incarcerated in FCI, Ray Brook. (App. 4).  Exhibit 3 attached to the plaintiff's deposition contains a medical report of Dr. Mina dated October 25, 2001, which states that "This inmate will require an ankle arthodesis and a left shoulder head arthroplasty."  (App. 18).  The report does not say when such procedures would be necessary.  (App. 18).

6

9.  The next report of Dr. Mina dated May 9, 2002, provides: "He will need a total shoulder replacement, and an ankle fusion. However[,] I do not feel that the traumatic O.A. [osteoarthritis] is severe enough to warrant surgery at this time. Also he is somewhat young for a jt. replacement. He should continue with conservative treatment." (App. 19).

10. On January 30, 2003, Dr. Mina wrote another consultation report in which he stated: "Still has pain in right ankle and left shoulder. No change. Recommendation the same. [Conservative treatment] for longer. Eventually will need an ankle fusion." (App. 20).

11. In April of 2003, the plaintiff was transferred to FCI Pekin. (App. 4).

12. The basis for the plaintiff's complaint is his allegation that while at FCI Pekin he should have had an outside consultation for surgery relative to his shoulder and foot injuries. (Comp.4; App. 5, 6).

13. The plaintiff states that he saw Samalia at "main line" on a number of occasions or at other places in the prison compound. (App. 10-11). The plaintiff claims he informed Samalia of his diabetes and his need for special shoes. (App. 10-11). The plaintiff testified that after he complained to Samalia about his diabetes or need for shoes, Samalia would tell him to go to the health care unit in order to be evaluated by the medical staff. (App. 11).

14. There is no allegation in the plaintiff's complaint of deliberate indifference relative to the plaintiff's diabetes. In fact, the plaintiff specifically testified that the care which he received relative to his diabetes is not a part of this lawsuit. (App. 10).

15.   When asked why he is claiming that Samalia was the one who violated his constitutional rights, the plaintiff answered that he kept running into Samalia and telling him that he was a diabetic and needed soft-soled shoes, but Samalia just kept sending him to see the medical staff.  (App. 11).

**Declaration of Dr. Oneida Dalmasi, M.D.**

16.   Dr. Dalmasi was a physician at FCI, Pekin who evaluated Moore.  (App. 21, 22). She noted that Moore had ankle and shoulder pain connected with osteoarthritis. (App. 22). Upon Moore's arrival at FCI, Pekin, Dalmasi gave him a lower bunk pass, an order for no pushing, pulling or lifting more than 30 pounds and a recreation restriction due to his ankle and shoulder condition.  (App. 22).

17.   On June 30, 2003, Dalmasi made a medical notation to refer Moore to an outside orthopedist.  (App. 22).  Dalmasi noted that the final decision for this referral was to be made by the Clinical Director, Dr. Ortiz, at a meeting of the Utilization Review Committee ("URC").  (App. 22).

18.   Dalmasi saw Moore on August 13, 2003, and on August 27, 2003, in the chronic care clinic.  (App. 22) Dalmasi noted that Moore had decreased range of motion in his right ankle along with some mild swelling. (App. 22) However, Dalmasi's assessment was that this condition was related to Moore's diabetes mellitus, uncontrolled hypertension, hyperlipidema and mild asthma.  (App. 22) She also noted that Moore was not compliant with his medications and was not following his diet which aggravated his condition. (App. 22).

8

19.   In an effort to get control of the diabetes and hypertension, Dalmasi instructed Moore to decrease his sodium intake, decrease greasy food, avoid smoking and exercise to the extent he could tolerate it.  (App. 22).  She ordered lab work and changed his medication. (App.22).  Dalmasi gave Moore 30 days to follow her instructions or she would consider insulin treatment.  (App. 22).

20.   Dalmasi noted that on September 24, 2003, the URC met to discuss several cases, including Moore's, at which it was decided to defer Moore's referral to an orthopedist. (App. 23).  The decision to defer the surgical consult was based upon the committee's consideration of the following factors: the most recent orthopedic consult took place in January 2003 and, while the orthopedist acknowledged that Moore would need surgery in the future, recommended conservative treatment in the near term as Moore was relatively young for such surgery.  (App. 23).  There also did not appear to be any change in the function or use of his ankle or shoulder which was counter-indicative for surgery.  (App. 23).

21.   Moore continued to be monitored by Health Services staff which instructed him on proper methods of diet and exercise to get control of his diabetes and high blood pressure.  (App. 23).  According to Dr. Dalmasi, Moore's excessive weight along with his diabetes was putting great pressure on his joints, which in turn caused the swelling of his ankle that decreased his range of motion.  (App. 23).  Dalmasi testified: "From a clinical standpoint, Moore's uncontrolled diabetes, hypertension, and weight were the biggest health concern and there was an immediate need to get those under control."  (App. 23).

9

22.    Dalmasi also testified that in her clinical judgment, Moore's left shoulder and right ankle were properly treated through pain medications and a variety of restrictions related to work and recreation.  (App. 23).

23.    At the time Moore was 44 years old which is young to consider joint replacement. (App. 23-24).   Prior to allowing surgery on either Moore's ankle or shoulder, Moore's diabetes needed to be under control and it was not.  (App. 24).

24.    Dalmasi also testified that the defendant, Samalia had no authority to order any type of treatment or surgery.  (App. 24).  The final decision of whether Moore's condition warranted surgery rested not with Samalia, but with the Clinical Director, who at that time was Dr. A. Ortiz.  (App. 24).

**Declaration of Dr. Angel Ortiz**

25.    Dr. Ortiz is employed by the United States Department of Justice, Federal Bureau of Prisons (BOP).  He is a licensed physician and is currently employed as the Clinical Director at FCI Pekin.  (App. 25).  He has held this position from April 2002 to November 2003, and from January 2005 to the present.  (App. 25).

26.    As Clinical Director, Ortiz oversees the clinical aspects of the Health Services Unit at FCI Pekin to ensure that appropriate and necessary medical services are provided to inmates by professional staff.  (App. 25).  Samalia, the Health Services Administrator, is responsible for the administrative functions of the Unit.  (App. 25).

27.    Attached to Ortiz's declaration are true and correct copies of Moore's public information and medical records generated at FCI Pekin, which were kept in the regular course of business of the BOP.  (App. 25, 36-74).

10

28.     Based on those records, Ortiz testified that Moore arrived in BOP custody (at the Federal Detention Center in Milan, Michigan) in September 1996.  (App. 25, 37). In February 1997, he was transferred to the Federal Correctional Institution in Beckley, West Virginia.  (App. 25, 37).  In November 1999, he was transferred to the Federal Correctional Institution in Elkton, Ohio.  (App. 25-26, 36).  In March 2001, he was transferred to the Federal Correctional Institution in Ray Brook, New York. (App. 26, 36).  In April 2003, he was transferred to FCI Pekin.  (App. 26, 36).

29.     Upon his arrival into BOP custody in 1996, Moore reported a history of a left shoulder injury (reportedly occurring in 1990) to medical staff.  (App. 26).  The medical staff determined that Moore suffered from arthritis in the left shoulder.  (App. 26).  Between September 1996 and his arrival at FCI Pekin in April 2003, Moore received several x-rays of his shoulder.   (App. 26).   The x-rays indicated degenerative changes, a possible old fracture on the head of the humerus, formation of large degenerative spurs, a large calcification in the axillary area, inferior to the humeral neck, which may be due to chondrocalcinosis.  (App. 26). Moore was also seen by three orthopedists and had an MRI of the shoulder.  (App. 26).  All three orthopedists indicated that a total shoulder replacement would likely be needed at some point in the future.  (App. 26).  None of the orthopedists ordered a shoulder replacement.  (App. 26).

30.     The last consultation with an orthopedist prior to Moore's arrival at FCI Pekin was in January 2003.  (App. 26) That orthopedist had expressed concern that Moore was too young to consider replacement at that point and ordered conservative symptomatic treatment.  (App. 26).

11

31.     Moore arrived at FCI Pekin on April 23, 2003.  (App. 27, 36).  On that day, Moore received an intake screening from L. Jump, R.N.  (App. 27, 40-41).  He reported chronic problems and no pain.  (App. 27, 40).  He was assessed with a history of non-insulin dependent diabetes mellitus, hypertension, cholesterol, and asthma. (App. 27, 40).  He was given a tuberculosis skin test and given prescriptions for medications.  (App. 27, 40).

32.     On May 8, 2003, Moore received a physical from Physician's Assistant H. Hansen. (App. 27, 41).  Upon examination, it was noted that his right ankle was swollen and he had decreased sensation in his feet.  (App. 27, 41).  A history of asthma, hypertension, degenerative joint disease in his left shoulder and right ankle, hyperlipidemia, diabetes mellitus - type II, and a history of surgery to his left knee were noted.  (App. 27, 41). Prescriptions were ordered, testing was ordered, and he was added to the chronic care clinic for 3 months.  (App. 27, 41).  Moore was also given a lower bunk permit, was medically unassigned (unable to be assigned to any work assignment for medical reasons), and given a short line permit[1], all for 30 days. (App. 27, 41).

33.     On June 10, 2003, Ortiz ordered a refill of Naproxen.  (App. 27, 31, 42).  In addition, Physician's Assistant Robert Jackson wrote a lower bunk pass, short line pass, and ordered medically unassigned until June 13.  (App. 27-28, 66).  On June 13, 2003, Physician's Assistant Jackson extended the lower bunk permit and short line permit

---

[1]A "short line" order would allow an inmate to attend meals earlier than his unit because of some medical need, usually to prevent prolonged standing.

12

until June 23, 2003.  (App.  28, 65).  On June 23, 2003, Ortiz extended the lower bunk permit and short line permit until June 30.  (App. 28, 66).

34.   On June 30, 2003, Moore was seen by Dr. 0. Dalmasi for medical evaluation.  (App. 28, 42).  Moore reported right ankle pain, left shoulder pain, and a motor vehicle accident in 1988.  (App. 28, 42).  Dr. Dalmasi noted that the x-ray of Moore's left shoulder and right ankle indicated osteoarthritis.  (App. 28, 42).  Limited range of motion in the left shoulder and mild tenderness to palpitation were noted, but no deformities were seen.  (App. 28, 42).  The right ankle was found to have a decreased range of motion and flexion, extension, and rotation of the ankle were noted as painful.  (App. 28, 42).  Flatfoot was noted as well as being tender to palpation.  (App. 28, 42).  The assessment was osteoarthritis of Moore's left shoulder and right ankle.  (App. 28, 42).  The plan was noted as a referral to an orthopedist, a lower bunk pass for one year, an order for no pushing, pulling or lifting more than 30 pounds, a recreation restriction, and a prescription for Naproxen.  (App. 28, 42-43, 67-69).  "Short line" and medical unassignment were discontinued.  (App. 28, 42).

35.   On July 29, 2003, Ortiz ordered a refill on Naproxen for pain management.  (App. 28, 42).  On August 13, 2003, Moore was seen again by Dr. Dalmasi.  (App. 28, 43).  Medications were refilled.  (App.28, 43).

36.   On August 21, 2003, Moore was seen by Scott Schumm, R.N., with complaints of chest pain.  (App. 28, 44).  After examination, Ortiz ordered continuation of medications and ordered Moore to avoid foods with sodium.  (App. 28, 44).  On August 22, 2003, Moore failed to show for an appointment with Ortiz.  (App. 28-29,

13

44).  The appointment was rescheduled.  (App. 29, 44).  On August 25, 2003, labs were drawn by D. Meyers, Radiologist Technician.  (App. 29, 44).

37.    On August 27, 2003, Moore was seen by Dr. Dalmasi in the chronic care clinic. (App. 29, 45-46).   Moore reported that he had not been compliant with his medications and that he had not been following his diet.  (App. 29, 45).  Upon examination, it was noted that he had decreased range of motion in his right foot and mild swelling in the right ankle.  (App. 29, 46).  Assessments included non-insulin dependent diabetes mellitus, uncontrolled hypertension, hyperlipidemia, and mild asthma.  (App. 29, 46).  Moore was instructed to decrease sodium intake, decrease greasy food, avoid smoking, and to exercise as he could tolerate.  (App. 29, 46). Labs were ordered and his medication was changed.  (App. 29, 46).  Moore was given 30 days to begin following medical instructions or he may be considered for insulin.  (App. 29, 46).

38.    On September 24, 2003, the URC deferred the referral to the orthopedist.  (App. 29, 47, 68, 71).   The committee noted that Moore had a history of a motor vehicle accident and that an orthopedic consult at FCI Ray Brook indicated that Moore was not then a candidate for surgery.  (App. 29, 71).  Because Moore had a recent orthopedic consultation which had recommended symptomatic treatment for the time being and there was no apparent change in function, the orthopedic referral was deferred.  (App. 29, 71). It was recommended that Moore would be followed in the chronic care clinic. (App. 29, 71).  These appointments with the chronic care clinic were to provide routine opportunities to monitor any change in function, as well as monitor Moore's compliance with his other medical recommendations.  (App.29).

14

39.  On November 5, 2003, Moore was again assessed by Dr. Dalmasi at the chronic care clinic.  (App. 30, 49).  Moore's only complaint was of right foot pain.  (App. 30, 49). After examination, the assessment was uncontrolled non-insulin dependent diabetes mellitus, uncontrolled hypertension, mild intermittent asthma, and hyperlipidemia. (App. 30, 50).   Labs were ordered, instructions on diet, smoking, and exercise were given, medications were ordered, and a follow-up appointment was made.  (App. 30, 50).

40.  On December 23, 2003, Moore was seen by G. Meyers, R. N. with complaints of shortness of breath, wheezing, coughing, runny nose, decreased appetite, nausea, and aching bones.  (App. 30, 51).  After assessment and on verbal order of Dr. Dalmasi, Moore was prescribed Keflex, Tylenol, Actifed, informed to increase fluids, and he was given Albuterol and Atrovent treatments.  (App. 30, 51).  Moore was given a two day lay-in from his work assignment.  (App. 30, 51, 68).

41.  On January 14, 2004, x-rays were taken of Moore's right foot.  (App. 30, 72).  The report indicated an old fracture deformity at the medial malleolus and the posterior lip of the tibia. (App. 30, 72).  Also noted were multiple large soft tissue ossifications anterior to the Achilles tendon and mild degenerative osteoarthritic change of the first metatarsophalangeal joint.  (App. 30-31, 72).

42.  On January 22, 2004, Moore was seen by R. Jackson, Physician's Assistant, with complaints of pain and weakness in his right shoulder.  (App. 31, 53).  Moore also reported that he had increased pain in his right foot, history of an old fracture with osteoarthritis and possible calcified bodies in joint, and that pain involved the entire foot. (App. 31, 53).  The shoulder was unable to be examined because Moore

15

"tightened it up." Mild general tenderness with erythema (reddening of the skin) in right foot was noted. (App. 31, 53).  The assessment was "causalgia vs. diabetes neuropathy in foot" and degenerative joint disease in left shoulder.  (App. 31, 53). The plan was a prescription for Carbamazepine, idle for 3 days, referral to Dr. Dalmasi to determine long term care. (App. 31, 53).

43.   On January 26, 2004, Moore was seen by G. Meyers, R.N., with complaints of right ankle pain, left shoulder pain.  (App. 31, 54).  It was noted that he demonstrates a gait when walking by guarding right ankle, and slight swelling, no deformity, and decreased range of motion with pain associated were noted. (App. 31, 54).  The left shoulder was noted to have a decreased range of motion, no palpable pain, and no crepitus (crackling sound). (App. 31, 54).   Dr. Dalmasi gave a verbal order for Tylenol, a crutch (1 day), and Moore was ordered to elevate the foot and follow-up on January 27.  (App. 31, 54).   It does not appear that Moore returned on the 27th. (App. 31).

44.   On February 10, 2004, Moore was seen in the chronic care clinic by Dr. Dalmasi. (App. 31, 55-56).  He complained about pain in his legs with walking or exercise and pain in his right ankle and left shoulder.  (App. 31, 55).  After examination, the assessment was uncontrolled non-insulin dependent diabetes mellitus, uncontrolled hypertension and mild intermittent asthma.  (App. 31, 56).  An x-ray of the left shoulder was ordered, labs were ordered, medications were filled, and appointments for an optometrist and dietician were recommended.  (App. 31-32, 56).

16

45.     On February 20, 2004, an x-ray of Moore's left shoulder was taken.  (App. 32, 57,

        73).  The impression was a healing fracture deformity of the left shoulder joint with

        marked degenerative osteoarthritic change of the left shoulder.  (App. 32, 73).

46.     On April 13, 2004, Moore did not appear for his scheduled sick call appointment.

        (App. 32, 58).  On April 23, 2004, Moore was seen by R. Jackson, Physician's

        Assistant with complaints of ankle pain, helicobacter pylon treatment failure, and

        tender nodule in right axilla.  (App. 32, 58).  Evaluation revealed a one centimeter

        rash in the right axilla and a tender ankle.  X-rays showed calcification soft tissue

        around Achilles.   (App. 32, 58). Assessment was Helicobacter pylon treatment

        failure, degenerative joint disease in ankle with possible myositis ossificans, and

        hydradenitis suppurativa. (App. 32, 58).  The treatment plan included prescriptions

        for Ranitidine, Dicloxacillin, and Tylenol, a heel cup and referral to a BOP physician

        to examine the ankle.  (App. 32).

47.     On April 28, 2004, a request for consultation with a dietician was completed by A.

        Wade, R.N.  (App. 32, 58).  On May 3, 2004, labs were drawn by D. Meyers, RT(R).

        (App. 32,  59).

48.     On May 24, 2004, Moore was seen in the chronic care clinic and examined by Dr.

        Dalmasi.  (App. 32, 60-61).  He reported that he was noncompliant with his current

        medications and complained of heartburn.  (App. 32, 60).  It was also noted that he

        was asymptomatic and that he only referred to right foot pain sometimes.  (App. 32,

        60).  After examination, the assessment was uncontrolled non-insulin dependent

        diabetes mellitus, uncontrolled hypertension, mild intermittent asthma, and

        osteoarthritis in the right foot.  (App. 32, 61).  Labs, an EKG, and medications were

17

ordered. (App. 32-33, 61).  In addition, Moore's sports restriction was discontinued. (App. 33, 61).

49.   On June 25, 2004, Moore left FCI Pekin.  (App. 33, 36).  An in-transit medical summary was prepared by R.N. L. Jump.  (App. 33, 36, 74).

50.   Based upon Ortiz's training and experience, it is his clinical judgment that Moore's condition is the result of post traumatic osteoarthritis secondary to various accidents aggravated by uncontrolled diabetes mellitus, uncontrolled hypertension and weight. (App. 33).  The conservative approach of treating the symptoms was in Ortiz's medical opinion the appropriate treatment procedure.  (App. 33).

51.   Only three months prior to arriving at FCI Pekin, Moore had been evaluated by an orthopedist at the Federal Correctional Institution in Ray Brook, New York.  (App. 20, 33).  That evaluation, while noting that the plaintiff would eventually need surgery, recommended the conservative approach of treating the symptoms.  (App. 20, 33).   Since that consultation, Moore was followed clinically and no recommendation for surgery was made.  (App. 33).  Also, while at FCI Pekin, there were no further alterations in function and so another consultation with an orthopedist was not warranted at that time.  (App. 33).  Thus, the URC deferred an orthopedic consultation.  (App. 33).  Ortiz was responsible for this decision.  (App. 33).

52.   In Ortiz's medical judgment, a decision to perform surgical procedures to replace the shoulder and ankle is based upon considerations of age, pain, and alteration of function. (App. 33).  Although Moore suffered pain and some limitation in the use of

the various areas, such issues were not significant enough at the time in question to warrant surgery. (App. 33).

53.    Ortiz testified that he considered Moore's age (44 at the time he left FCI Pekin) to be an important factor in determining whether joint replacement surgery is warranted. (App. 33). According to Ortiz, every effort should be made to avoid premature surgery particularly given the fact that the surgery will not necessarily alleviate the pain. (App. 33). If the ankle fusion is done, Moore will likely suffer greater limitations and will still suffer pain. (App. 33). Ordinarily, Ortiz would not recommend this type of surgery until a patient is at least 60 years old. (App. 33-34).

54.    Moore's shoulder and ankle were treated symptomatically. (App. 34). He was provided a variety of pain medications and a variety of restrictions (including lower bunk restrictions, recreation restrictions, time off of his work assignments, and short line permits). (App. 34). In addition, it is documented that Moore has, at times, failed to follow the medical advice provided. (App. 34). Moore missed appointments, failed to follow necessary diet instructions, and was noncompliant with medications. (App. 34).

55.    Moore's failure to follow medication advice and dietary restrictions contributed to the uncontrolled status of his hypertension and diabetes. (App. 34). These uncontrolled conditions are important factors to consider anytime surgery is contemplated. (App. 34). The primary medical goal during his time at FCI Pekin was for Moore to gain control of the hypertension and diabetes. (App. 34). Until those factors were under control, joint replacement surgery was not a practical option. (App. 34).

56.     Ortiz also testified that as the Health Services Administrator, Ferdinand Samalia had
        no authority to order a consultation with an orthopedist, nor could Samalia order any
        type of treatment or surgery.  (App. 34).  Samalia's duties as the Health Services
        Administrator are administrative in nature.  (App. 34).  He was not, and is not,
        privileged to provide any clinical care to inmates.  (App. 34).  Had a referral or
        surgery been approved, Samalia would have been responsible for ensuring that it
        was scheduled and completed.  (App. 34).  While Samalia does sit on the URC, his
        responsibilities do not include clinical treatment decisions.  (App. 34).  The decision
        to defer the consultation with the orthopedist was made by Ortiz.  (App. 34).

**Declaration of Ferdinand Samalia**

57.     Defendant Ferdinand Samalia is employed by the United States Department of
        Justice, Federal Bureau of Prisons (BOP), as the Health Services Administrator at
        the Federal Correctional Institution in FCI Pekin. He has been so employed since
        September 1995. (App. 75).

58.     As the Health Services Administrator, Samalia is responsible for the administrative
        functions of the Health Services Unit which includes housekeeping, sanitation,
        maintenance, personnel, budget, procurement, and supply functions of the unit.
        (App. 75).

59.     Samalia is not responsible for the clinical care and treatment of inmates confined at
        FCI Pekin. That responsibility lies with the Clinical Director, whom he does not
        supervise. (App. 75).

20

60.   Although Samalia is trained as a Physician's Assistant, he is not authorized to see patients in a clinical role and does not maintain privileges with the BOP to practice in that capacity.  (App. 75).

61.   Samalia did not attend to Moore's medical needs while he was incarcerated at FCI Pekin. At no time did Samalia medically assess Mr. Moore or provide any medical treatment to Mr. Moore.  (App. 75).

62.   Although Samalia was a member of the URC, he did not make any decisions or recommendations regarding whether or not to refer Mr. Moore to an orthopedist. (App.76).

63.   If the URC had approved the referral to an orthopedist, Samalia would have ensured that the appointment was made.  If the URC had recommended surgery, Samalia's duties would have required him to ensure that the proper arrangements were made for the ordered procedure to occur.  (App. 76).  In fact, the plaintiff had been experiencing pain in both his ankle and his shoulder relative to osteoarthritis. Moore also was diagnosed with diabetes mellitus, and hypertension which aggravated his joint pain.

### Discussion

The plaintiff sues Mr. Samalia in both his official and his unofficial capacities. (Complaint.1).  To the extent that the plaintiff's *Bivens* action seeks damages against Samalia in his official capacity, judgment is warranted in favor of the defendant.  While this court has jurisdiction under 28 U.S.C. § 1331 to entertain a *Bivens* action against federal employees sued for damages in their individual capacities, *Davis v. Passman,* 442 U.S. 228 (1979), § 1331 does not constitute a waiver of the government's sovereign immunity from

suit as a result of constitutional misconduct committed by its employees.  *See generally, Radin v. United States,* 699 F.2d 681, 685 (4th Cir. 1983); *Norton v. United States,* 581 F.2d 390, 393 (4th Cir. 1978). The United States and its agencies are generally immune from damage liability unless their immunity is expressly waived.  *United States v. Mitchell,* 445 U.S. 535, 538 (1980).  The United States and its agencies may not be named as parties and sued without specific statutory consent, and a waiver of sovereign immunity will not be implied but must be unequivocally expressed.  *See, e.g., Champaign-Urbana News Agency, Inc. v. J. L Cuminins News Co., Inc.,* 632 F.2d 680, 687 (7th Cir. 1980); *Shelton v. U.S. Customs Service,* 565 F.2d 1140 (9th Cir. 1977).

An action for money damages against a federal officer in his official capacity is in reality an action for money damages against the government entity.  *Edelman v. Jordan,* 415 U.S. 651, 653 (1974); *Dugan v. Rank,* 372 U.S. 609, 620 (1974).  Because the doctrine of sovereign immunity prohibits actions against the United States unless the United States consents to be sued, *United States v. Testan,* 424 U.S. 392, 399 (1976), such an action cannot be maintained against an officer in his official capacity. *See, Hill v. Thalacker,* 2004 WL 2730253, *4 (W.D. Wis. 2004)(Prisoner could not bring a *Bivens* action against a federal employee in his official capacity.)  As the district court in *Perrott v. U.S.,* 2001 WL 40799, *2 (N.D. Illl. 2001) explained:

> A   *Bivens* action is analogous to 42 U.S.C. *§* 1983 in that it recognizes a private right of action for damages against a federal agent acting under color of federal law for the agent′s violations of federal constitutional rights.  *See Carison v. Green,* 446 U.S. 14, 18 (1980).  *Bivens* claims against the United States or federal agents acting in their official capacity are barred by sovereign immunity.  *See, e.g., Kaufmann v.*

22

> *United States,* 840 F. Supp. 641, 648 (E.D. Wis. 1993);
> *Parsons v. Aguirre,* 123 F.R.D. 293, 298 (N.D. Ill. 1988);
> *Anderson v. Luther,* 521 F.Supp. 91, 96 (N.D. Ill. 1981).
> However, a *Bivens* claim can be brought against individual
> defendants acting in their personal capacities.  *See Carison,*
> 446 U.S. at 20; *Kaufmann,* 840 F. Supp. at 648.

*Id.* "[T]he point of *Bivens* was to establish an action against the employee to avoid

the sovereign immunity that would block an action against the United States and thus would

block an official-capacity action too." *Sterling v. United States,* 85 F.3d 1225, 1229 (7th Cir.

1996).  To the extent that Moore's complaint is brought against Samalia for actions taken

in his official capacity, the defendant is entitled to and granted summary judgment.

Further, Samalia is entitled to judgment in his favor on those allegations brought

against him in his personal capacity.   The facts show that Samalia did not have

responsibility and exerted no responsibility for the plaintiff's health care.

To establish a denial of adequate medical care claim under the Eighth Amendment,

a prisoner must prove that prison officials responded to a serious medical need with

"deliberate indifference."  *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).  However, "[a]

prisoner may not attribute any of his constitutional claims to higher officials by the doctrine

of *respondeat superior;* the official must actually have participated in the constitutional

wrongdoing." *Antonelli v. Sheahan,* 81 F.3d 1422, 1428 (7th Cir. 1996)(internal quotations

omitted).

In *Crowder v. Lash,* 687 F.2d 996 (7th Cir. 1982), the Seventh Circuit set forth

the standard for individual responsibility for a deprivation of a constitutional right:

> [A] plaintiff must establish defendants' personal responsibility
> for the claimed deprivation of a constitutional right. ... However,
> a defendant's direct participation in the deprivation is not

23

> required. An official satisfies the personal responsibility
> requirement of section 1983 if she acts or fails to act with a
> deliberate or reckless disregard of plaintiff's constitutional
> rights, or if the conduct causing the constitutional deprivation
> occurs at her direction or with her knowledge and consent.

*Id.* at 1005 (internal citations omitted).

There is no respondeat superior liability for supervisory officials for the allegedly unconstitutional acts of their subordinates. *Rizzo v. Goode,* 423 U.S. 362, 377 (1976). Without a showing of direct responsibility of the improper action, liability will not lie against a supervisory official. *Rascon v. Hardiman,* 803 F. 2d 269, 273 (7th Cir. 1986).

The plaintiff complains that he saw Samalia at "main line" on a number of occasions or at other places in the prison compound. (App.10-11). "Main line" is the prison term for standing in line at the dining hall waiting to get a meal. (App. 11). The plaintiff claims he informed Samalia of his diabetes and his need for special shoes. The plaintiff testified that after he complained to Samalia about his diabetes or need for shoes, Samalia would tell him to go to the health care unit in order to be evaluated by the medical staff. (App. 10-11). When asked why he is claiming that Samalia was the one who violated his constitutional rights, the plaintiff answered that he kept running into Samalia and telling him that he was a diabetic and needed soft-soled shoes, but Samalia just kept sending him to see the medical staff. (App. 11, pp. 36-37).

Samalia was an administrator, albeit a health care administrator, within FCI Pekin and was not a health care provider. (App. 75). In his position, Samalia was not responsible for providing medical treatment to the inmates at the institution and he did not provide medical care to the plaintiff. (App.75). Samalia is responsible for the administrative functions of the Health Services Unit. (App. 75). In that capacity he is responsible for the

housekeeping, sanitation, maintenance, personnel, budget, procurement and supply functions of the Unit. (App. 75). He does not provide direct medical care to the inmates. (App. 34, 75). The responsibility for providing medical care to the inmates lies with the Clinical Director and Samalia has no responsibility for the supervision of the Clinical Director. (App. 75). Further, Samalia does not maintain privileges within the Bureau of Prisons to treat patients for medical concerns. (App. 75). Therefore, Samalia could not and did not assess the plaintiff's condition, nor did he provide any medical treatment to the plaintiff. (App.75). Instead, Samalia took appropriate action by sending the plaintiff to the medical unit for an assessment. The fact that the plaintiff disagreed with the care he received at the medical unit does not make Samalia liable under the Eighth Amendment for deliberate indifference to his serious medical needs.

As the United States District Court for the Northern District of Illinois reasoned:

> Gora and Luther are prison administrators, not licensed medical practitioners. Lacking the requisite expertise, they must necessarily place their confidence in the reports of the prison doctors whenever an inmate disputes a medical opinion as to what treatment is necessary and proper. Defendants here clearly deferred to the professional medical judgment of the doctors attending plaintiff with respect to... the propriety of his treatment. ... Defendants' reliance upon the opinion of their medical staff as to the proper course of treatment for plaintiff is sufficient to insulate them from any liability under the eighth amendment. *See, McCracken v. Jones,* 562 F.2d 22, 24 (10th Cir. 1977); *see also McEachern v. Civiletti,* 502 F.Supp. 532, 534 (N.D. Ill. 1980).

*See also Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920 (N.D. Ill 2002)("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving

inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.")(other citations omitted).

Similarly, Samalia's directing the plaintiff to medical staff to evaluate his health needs was entirely appropriate given Samalia's limited functions as a health services administrator. He should not and did not provide the plaintiff with medical care. Although it does not appear that the plaintiff has presented such an allegation, if he were to assert that Samalia demonstrated deliberate indifference to the plaintiff's serious medical needs by blocking his access to an outside consultant, summary judgment is still warranted. All referrals for outside consultants at FCI Pekin go through the Utilization Review Committee ("URC"). (App. 76). Although Samalia was a member of that committee, he did not make any decisions or recommendations regarding whether the plaintiff should see an outside consultant. (App.76). Because of his position as administrator, Samalia does not make clinical recommendations. (App. 34). Had the URC made a recommendation for surgery, Samalia would have ensured the proper arrangements were made for the procedure to occur. (App. 76). However, it was the clinical director, Dr. Angel Ortiz, and not Samalia, who determined that surgery was not warranted at that time. (App. 2l, 34, 75).

Even if Samalia were the proper defendant, the plaintiff's allegations do not rise to the level of a constitutional violation. The Eighth Amendment prohibits excessive bail, excessive fines, and "cruel and unusual punishments." In *Estelle v. Gamble,* 429 U.S. 97 (1976), the Supreme Court defined the application of the Eighth Amendment to prison medical care:

26

> Similarly, in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Id.* at 105-106.

Complaints must rise above a mere disagreement between an inmate and medical personnel with respect to diagnosis and treatment. *Id.* at 107. An inadvertent failure to provide medical care or simple negligence does not amount to a constitutional violation. *Id.* at 106. The Seventh Circuit has had held that even gross negligence does not rise to deliberate indifference. *Matos ex. rel. Matos*, *v. O'Sullivan,* 335 F.3d 553, 557 (7th Cir. 2003).

In the medical context, the court looks at the totality of an inmate's medical care to evaluate whether a doctor was deliberately indifferent to the inmate's medical needs. *Dunigan ex re. Nyman v. Winnebago County,* 165 F.3d 587, 591 (7th Cir. 1999); *Gutierrez v. Peters,* 111 F.3d 1364, 1375 (7th Cir. 1997). "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm,* 94 F.3d 254, 262 (7th Cir. 1996) (quoting *Youngberg v. Romeo,* 457 U.S. 307, 323 (1982)(footnotes

omitted)).  "Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference." *Id.* at 261.

When a medical professional incorrectly exercises professional judgment, he may be liable for malpractice, but not for a constitutional violation. The Eighth Amendment is not a medical malpractice statute, and the deliberate indifference standard is much stricter than a negligence standard. *See Snipes v. DeTella,* 95 F.3d 586, 590 (7th Cir. 1996). Physicians will disagree about whether a particular course of treatment is appropriate, or even if treatment is appropriate at all, but a disagreement in treatment alone will not support a constitutional violation.  *Id.*

To support his claim that he needed surgery, the plaintiff relies upon several doctor reports that state that at some time he will need to have surgery for his shoulder and his foot. These reports are attached to his deposition transcript.  (App. 16-20).

Exhibit 1 contains two reports from Dr. Robert Bateman.  (App. 16).  On August 28, 1999, Dr. Bateman wrote:  "He will need to have a total shoulder replacement. ... He will need to get a MRI of the left shoulder to evaluate it more thoroughly. ... He needs to continue taking Motrin. ...  " (App. 16).  On September 14, 1999, Dr. Bateman wrote that the plaintiff needs to see an orthotist for corrective shoes and that "[h]e needs a MRI to determine the correct procedure to be done for probably a surgical replacement."  (App. 16).  At that time, the plaintiff was at FCI Beckley.  (App. 4).

Exhibit 2 is a report from Dr. Timothy Domer, D.O. made on April 11, 2000, while the plaintiff was at Elkton Prison.  (App.1 7).  That report states:  "There are no specific recommendations for treatment other than symptomatically at this time.  I did offer the patient an intra-articular Cortisone injection to the right ankle.  He did refuse.  The patient

28

has markedly severe arthritis to the left shoulder and really his only option is for possibly total shoulder replacement.   There are no acute recommendations for symptomatic treatment.  A lighter shoe may benefit the patient for symptomatic relief of pain secondary to arthritic changes of the right ankle."  (App. 17).  The plaintiff acknowledges that Dr. Domer did not recommend surgery at that time but only recommended that his symptoms be treated.  (App. 7).

Exhibit 3 contains a medical report of Dr. Mina dated October 25, 2001, which states that, "[t]his inmate will require an ankle arthodesis, and a left shoulder head arthroplasty." (App. 18).  The report does not say when such procedures will be necessary.  (App. 18). The next report of Dr. Mina dated May 9, 2002, provides: "He will need a total shoulder replacement, and an ankle fusion.   However I do not feel that the traumatic O.A. [osteoarthritis] is severe enough to warrant surgery at this time.   Also he is somewhat young for a jt. replacement.  He should continue with conservative treatment."  (App. 19). On January 30, 2003, Dr. Mina wrote another consultation report in which he stated: "Still has pain in right ankle and left shoulder.   No change.   Recommendation the same [conservative treatment] for longer.   Eventually will need an ankle fusion."  (App. 20).  In April of 2003, the plaintiff was transferred to FCI Pekin.  (App. 4).

The medical recommendations all note that the plaintiff will at some point in the future require surgery to correct his ankle and shoulder problems.   However, these recommendations also agree that surgery was not appropriate at that time.  The doctors consistently recommended Moore receive conservative treatment which was to attempt to reduce the pain through medications and restrictions to limit the use of the relevant joints.

While at FCI Pekin, this conservative treatment continued regarding Moore's joint pain. Moore continued to receive medication for pain relief and restrictions to limit the stress on his joints. Further, Moore was monitored to determine if there was a change in his medical condition. (App. 27, 28).

Dr. Dalmasi testified: "From a clinical standpoint, Moore's uncontrolled diabetes, hypertension, and weight were the biggest health concern and there was an immediate need to get those under control." (App. 23). At the time Moore was 44 years old which is young to consider joint replacement. (App. 23). Moore's condition was carefully followed when he was assigned to the chronic care clinic which monitored his joint pain. (App. 23-24). No changes were noted in the use of his joints - which was a counter-indicator for surgery. Important is the fact that prior to allowing surgery on either Moore's ankle or shoulder, Moore's diabetes needed to be under control and it was not. (App. 23-24).

This diagnosis and treatment regime was seconded by Dr. Ortiz, the clinical director at FCI Pekin. The URC only deferred the orthopedic consultation. The URC did not find that Moore would not at some time in the future need an orthopedic consult, just not in September of 2003. To support this decision, Ortiz relied on Moore's last orthopedic consultation while he was in FCI Ray Brook in January of 2003, which did not recommend surgery at that time. After Moore was transferred to FCI Pekin, in April 2003, he had been closely monitored and there had been no change in function in either his shoulder or ankle.

In Ortiz's medical judgment, a decision to perform surgical procedures to replace the shoulder and ankle is based upon considerations of age, pain, and alteration of function. Although Moore suffered pain and some limitation in the use of the various areas, such issues were not significant enough at the time in question to warrant surgery. (App.

33-34).  Ortiz testified that he considered Moore's age (44 at the time he left FCI Pekin) to be an important factor in determining whether joint replacement surgery is warranted. (App. 33).  According to Ortiz, every effort should be made to avoid premature surgery particularly given the fact that the surgery will not necessarily alleviate the pain.  (App. 33). If the ankle fusion is done, Moore will

likely suffer greater limitations and would likely still suffer pain.  (App. 33).  Ordinarily, Ortiz would not recommend this type of surgery until a patient is at least 60 years old.  (App. 34).

Thus, as had been Moore's treatment plan for a number of years, Moore's shoulder and ankle were treated symptomatically.  He was provided a variety of pain medications and a variety of restrictions (including lower bunk restrictions, recreation restrictions, time off of his work assignments, and short line permits).  (App. 34).

Finally, while at FCI Pekin, Moore had uncontrolled hypertension and diabetes. (App. 34).  The reason that these conditions were uncontrolled was because Moore consistently failed to follow his dietary restrictions and take the prescribed medicine.  (App. 34).  Gaining control of these conditions became the primary goal of his medical treatment at FCI Pekin.  (App. 34).  As Ortiz testified, these conditions needed to be controlled prior to any consideration of joint replacement surgery.  (App. 34).  For all of these reasons, the URC deferred an orthopedic consultation.

The plaintiff can show only that he disagrees with the consensus of the medical staff at FCI Pekin.  This is insufficient under the case law to establish an Eighth Amendment claim of deliberate indifference.  For all of the foregoing reasons, the court grants summary judgment in favor of the defendant.

**CONCLUSION**

Pursuant to Fed. R. Civ. P., Rule 56(c), the defendant, Samalia's summary judgment motion, d/e 22, is granted. The clerk of the court is directed to enter judgment in favor of the defendant and against the plaintiff pursuant to Fed. R. Civ. P., Rule 56(c). The case is terminated in its entirety. The parties are to bear their own costs.

If the plaintiff wishes to appeal this judgment, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $255.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).

ENTER this  28th  day of November, 2005.

s / John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE